# In the United States Court of Federal Claims

No. 17-9002
Filed: February 18, 2020

| | |
|---|---|
| IN RE DOWNSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS <br><br> THIS DOCUMENT APPLIES TO: <br><br> ALL DOWNSTREAM CASES | Fifth Amendment Taking; Motion to Dismiss; RCFC 12(b)(6); Motion for Summary Judgment; Act of God; Perfect Flood Control; Flood Control Act of 1928; 33 U.S.C. § 702c (2018); "Flood Water"; Protected Property Interest; Property Right |

*Rand P. Nolen*, Fleming, Nolen & Jez, L.L.P., *Derek H. Potts*, The Potts Law Firm, LLP, *William S. Consovoy*, Consovoy McCarthy Park, P.L.L.C., *David C. Frederick*, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., *Jack E. McGehee*, McGehee, Change, Barnes, Landgraf, *Richard Warren Mithoff*, Mithoff Law Firm, co-lead counsel for plaintiffs.

*Kristine Sears Tardiff* and *William James Shapiro*, U.S. Department of Justice, Environment & Natural Resources Division, counsel for defendant.

**OPINION AND ORDER**

**SMITH**, *Senior Judge*

This case is brought by residents of Harris County whose homes and properties were flooded by Hurricane Harvey in 2017. These individuals and families suffered both economic loss and the traumatic disruption of their lives, and they seek a remedy from the United States for an alleged taking of their property without just compensation. The Court can only dispense compensation for legal cause when a plaintiff's fundamental property rights have been violated by the United States. In bringing their Fifth Amendment Takings claim, plaintiffs allege that the United States Army Corps of Engineers ("Corps" or "Agency") violated their fundamental property rights. *See* Plaintiffs' Motion for Summary Judgment (hereinafter "Pls.' MSJ") at 1.

Two questions must be asked. First, what property did the government take? Second, how did the government take that property? The answers to these questions go to the heart of the Constitution's taking clause. The waters that actually caused the invasion came from the unprecedented floodwaters from Hurricane Harvey when it stalled over Houston for four days, dumping approximately thirty-five inches of water on Harris County. *See* Plaintiffs' Appendix (hereinafter "Pls.' App.") at A3140; *see also* Defendant's Exhibit (hereinafter "Def.'s Ex.") 12 at 591–92. The federal government erected two dams in the 1940s to mitigate against flood damages in the plaintiffs' area. *See* Pls.' App. at A2214. This storm, which overwhelmed the system's capacity was classified as a once in 2000-year event, Def.'s Ex. 12 at 594–95, which

means the last such event occurred during the life of Jesus!  Nevertheless, plaintiffs contend that their property was only inundated when the Corps opened the Addicks and Barker Reservoirs' (the "Reservoirs") gates to prevent additional upstream flooding.  Pls.' MSJ") at 1.  This leads the Court to the question of whether the government did something wrong?  The plaintiffs do not allege that it did, and, even if the plaintiffs had made such an allegation, the Court does not have tort jurisdiction, so it cannot analyze whether the government action was negligent.  The answer of what caused the damage is thus inescapable to the Court's eye and mind.  The damage was caused by Hurricane Harvey, and such a hurricane is an Act of God, which the government neither caused nor committed.

The remaining question is what were the property rights allegedly taken?  Plaintiffs suggest that the government took an easement against their property by storing of water on their lands.  Plaintiffs' Opposition to the Government's Motion to Dismiss (hereinafter "Pls.' Resp. to MTD") at 14.  Put a different way, plaintiffs allege that the government could have done more to ensure perfect flood control efforts, and because the government did not do more, it failed to stop the flooding of their lands.  Of course, the water from the hurricane was not the government's water, unless the storm was also created by the government's wind and air and sun and sky.  These were flood waters that no entity could entirely control.  The government attempted to mitigate against them, but it could not.  Thus, plaintiffs' claims are essentially that they were entitled to perfect flood control, simply because government set up a flood control system to help protect residents in the Houston area.  Plaintiffs also claim that the mere presence of the water control structures means that the government owned all waters that passed through them.  So, do plaintiffs have the right to be perfectly protected from flooding?  The simple answer is no; the right to perfect flood control it is not recognized by either Texas property law or federal law.  The purpose of the Constitution's Fifth Amendment protections is to protect legally recognized property rights, but those property rights can only be created by the states or the federal legislative and executive departments.  While the Court sympathizes with the plaintiff's loss, the Court's function is to say what the law is, not what the law might become.

This case comes before the Court on defendant's Motion to Dismiss and on the parties' Cross-Motions for Summary Judgment.  Plaintiffs allege that the Corps intentionally opened the gates and released massive volumes of water from the Addicks and Barker Reservoirs, causing widespread destruction to the homes and businesses located downstream from the Reservoirs along the Buffalo Bayou.  *See* Pls.' MSJ at 1.  Plaintiffs seek relief under the Takings Clause of the Fifth Amendment of the United States Constitution and contend that such a release was a temporary categorical physical taking, a temporary non-categorical physical taking, and a permanent non-categorical physical taking.  *See Id.* at 23–25.  In response, defendant makes the following four arguments: (1) plaintiffs failed to prove a crucial element of causation under the applicable legal standard or in accordance with legal precedent; (2) the alleged infringement was committed pursuant to the government's legitimate use of police powers; (3) the flooding that gives rise to plaintiffs' taking claims resulted from a singular, catastrophic hurricane and, at most, sounds in tort; and (4) under both Texas law and federal law, plaintiffs do not have a cognizable property interest in perfect flood control in the face of a record-setting Act of God such as Hurricane Harvey.  *See* United States' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (hereinafter "Def.'s CMSJ") at 2–3.  For the reasons that follow, the Court finds that neither Texas law nor federal law creates a

protected property interest in perfect flood control in the face of an Act of God. As the government cannot take a property interest that plaintiffs do not possess, plaintiffs have failed to state a claim upon which relief can be granted. As such, defendant's Motion to Dismiss is hereby granted, defendant's Cross-Motion for Summary Judgment is granted, and plaintiffs' Motion for Summary Judgment is denied.

## I. Background

### A. Construction of the Addicks and Barker Dams and Reservoirs

Between 1854 and 1935, the Houston area experienced six major flood events along the Buffalo Bayou. Pls.' at A3131; Def.'s Ex. 3 at 31. In response to the devastating floods in 1929 and 1935, the Texas Legislature established the Harris County Flood Control District ("HCFCD") in 1937, to implement flood damage reduction projects across Harris County. Def.'s Ex. 2 at 11; Def.'s Ex. 5. As a result of those same floods, Congress directed the Corps to study flood protection along the Buffalo Bayou and, through enactment of the Rivers and Harbors Act of June 20, 1938, authorized construction of the Addicks and Barker Dams and their corresponding Reservoirs as part of the Buffalo Bayou and Tributaries Project ("Project"). Def.'s Ex. 3 at 29, 26–28; Pls.' App. at A22. The sole purpose of the Project was to mitigate against flooding downstream of the Reservoirs—detention basins behind the dams "designed to collect excessive amounts of rainfall which would then be released into Buffalo Bayou at a controlled rate." Def.'s Ex. 7 at 209; Def.'s Ex. 8 at 272–74; Pls.' App. at A19; Pls.' App. at A2215.

Construction of the Barker Dam began in February of 1942 and concluded in February of 1945. Pls.' App. at A2214. Construction of the Addicks Dam began in May of 1946 and concluded in December of 1948. *Id.* Their reservoirs "serve in conjunction with approximately 7.4 miles of Buffalo Bayou channel improvements immediately downstream of the dams to provide flood protection along Buffalo Bayou." Pls.' App. at A20; Def. Ex. 4 at 175. The Reservoirs were originally designed to have four uncontrolled, ungated outlet conduits and one controlled outlet conduit. Pls.' App. at A24; Pls.' App. at A2226. By 1963, the Corps gated all five of the outlet conduits on each Reservoir to provide additional protection to downstream developments. Pls.' App. at A19–A20; Pls.' App. at 2226. Both Reservoirs are "dry dams," which means they generally do not hold any water. Pls.' App. at A19; Pls.' App. at A2210.

The Corps maintains and operates the Reservoirs in accordance with the Water Control Manual ("Manual"), which the Corps first implemented in April 1962 and updated in November 2012. Pls.' App. at A1–A158; Pls.' App. at A193–A280. The Corps generally operates the Reservoirs in accordance with the Manual's "Normal Flood Control Regulation," according to which the gates are closed under what the Corps deems "normal conditions," which exist "when 1 inch of rainfall occurs over the watershed below the reservoirs in 24 hours or less, or when flooding is predicted downstream." Pls.' App. at A49. More specifically, normal conditions exist "when the reservoir pools are not in the range of [the] induced surcharge schedule." Pls.' App. at A49. Under normal conditions, the Manual directs the operator of the Reservoirs to "[k]eep the gates closed and under surveillance as long as necessary to prevent flooding below

the dams." *Id.* The Manual also contains instructions for "Induced Surcharge Flood Control Regulation," according to which the Corps will open the gates under the following conditions:

> Induced Surcharge Flood Control Regulation. At any time the reservoir pool equals or exceeds 101 feet [North American Vertical Datum of 1988 ("NAVD 1988")] in Addicks Reservoir and 95.7 feet NAVD 1988 in Barker Reservoir[,] monitoring of pool elevation should immediately ensue to determine if inflow is causing pool elevation to continue to rise. If inflow and pool elevation conditions dictate, reservoir releases will be made in accordance with the induced surcharge regulation schedules shown on plates 7-03 and 7-04. The gates should remain at the maximum opening attained from the induced surcharge regulation schedules until reservoir levels fall to elevation 101 feet NAVD in Addicks and 94.9 NAVD 1988 feet in Barker. Then, if the outflow from both reservoirs when combined with the uncontrolled runoff downstream is greater than channel capacity, adjust the gates until the total discharges do not exceed channel capacity and follow the normal operating procedures.

Pls.' App. at A50. Accordingly, the Induced Surcharge Flood Control Regulation is triggered when the Reservoir pools reach specified elevations, and, once conditions allow for the return to normal flood control operations, the Corps releases floodwaters from the Reservoirs at a lesser rate until the Reservoirs are empty. Pls.' App. at A19–A20; Pls.' App. at A49–A50.

In or around 2007, the Corps formed the Addicks-Barker Multi-Agency Emergency Coordination Team ("ABECT"), which designated points of contact for federal, state, and local agencies and developed lines of communication for storm and flood events involving the Addicks and Barker Dams and Reservoirs. Def.'s Ex. 2 at 12–15. The ABECT routinely conducts emergency exercises and developed Emergency Action Response Charts for each reservoir that define the scope of responsibilities of each agency during flooding or emergency events when the water in the Reservoirs surpasses certain elevation levels. *See* Def.'s Ex. 2 at 12–15, 16–19; Def.'s Ex. 4 at 174; Def.'s Ex. 20 at 982–94.

### B. Plaintiffs' Acquisition of their Properties[1]

Between 1976 and 2015, plaintiffs acquired their respective properties. *See* Pls.' App. at A458–A492. The houses and structures on those properties were built between 1962 and 2016, either while under the ownership of plaintiffs or their predecessors. *See generally* Def.'s Ex. 35. All of the test properties are located in Harris County, Texas, along the Buffalo Bayou, and downstream of the Reservoirs. Pls.' App. at A1776. Additionally, all of the properties fall within the Buffalo Bayou watershed. Def.'s Ex. 4 at 76. Three of the properties are located within the 100-year flood zone, eight are located within the 500-year flood zone, and two fall

---

[1] For the purposes of this sub-section, and this sub-section alone, "properties" refers to the thirteen test properties designated in the Court's Order Regarding Test Property Selection. *See generally* Order Regarding Test Property Selection, No. 17-9002, ECF No 81. Additionally, "plaintiffs" in this sub-section refers exclusively to the individuals and entities that own those test properties. *See generally id.*

outside the 500-year floodplain.[2] *See generally* Pls.' App. at A1036–1147.  Nine of the plaintiffs remained free from flooding during the period between the acquisition of their properties and Harvey.  *See* Pls.' App. at A599–A625; *see also* Pls.' App. at A1036–1147.  Four of the plaintiffs experienced some flooding between the acquisition of their properties and Harvey, but they did not experience flooding to the same degree as what they experienced as a result of Harvey.  Pls.' App. at A626–A660.

### C. Hurricane Harvey and the Induced Surcharge Release

On August 25, 2017, Hurricane Harvey made landfall along the Texas coast as a Category 4 hurricane.  Pls.' App. at A3134.  Within twelve hours of making landfall, as Harvey moved towards Harris County, it weakened into a tropical storm but stalled over the Houston area for four days before moving into Louisiana on August 30, 2017.  *Id.*  Harvey maintained tropical storm intensity the entire time it was stalled inland over southeast Texas.  *Id.*; Def.'s Ex. 12 at 589.  During the storm, the Reservoir watersheds received an estimated 32-35 inches of rain, and the average rainfall across Harris County was 33.7 inches.  Pls.' App. at A3140; Def.'s Ex. 12 at 591–92.  After the storm passed and the extent of the devastation was established, the HCFCD analyzed the return frequency of the four-day rainfall totals and determined that Harvey fell within the range of a 2000-year to a greater than 5000-year flood event at all of the relevant storm gage locations.  Def.'s Ex. 12 at 594–95.

On August 23, 2017, prior to Hurricane Harvey's landfall, the Governor of Texas issued a disaster proclamation, warning residents that Harvey posed a threat of imminent danger to sixty counties, including Harris County.  *See* Def.'s Ex. 16 at 930.  That disaster proclamation was extended throughout the months that followed.  *Id.*  On August 25, 2017, the President of the United States, through the Federal Emergency Management Agency ("FEMA"), issued a federal disaster declaration for those same areas, including Harris County.  Def.'s Ex. 17 at 933.  In addition to the two disaster proclamations, the Corps activated the ABECT in advance of Harvey, and the group held its first call to discuss the impending storm on August 23, 2017.  Def.'s Ex. 20 at 976–79, 980–81.  Prior to and during the storm, the ABECT utilized the Corps modeling results and daily Corps Water Management System ("CWMS") Forecasts to monitor existing and forecasted conditions in the Reservoirs.  Def.'s Ex. 20 at 980–81; Def.'s Ex. 21 at 990–95.

According to Corps records and the CWMS Forecasts, both Reservoirs were empty, and the flood gates were set to their normal settings prior to Harvey's landfall on August 25, 2017,

---

[2]   "Five Hundred Year Floodplain (the 500-year floodplain or 0.2 percent change floodplain) means that area, including the base floodplain, which is subject to inundation from a flood having a 0.2 percent chance of being equalled [sic] or exceeded in any given year."  44 C.F.R. § 9.4 (2009).  In colloquial terms, this means that properties located within the 500-year floodplain have a 1-in-500 chance of flooding in a given year.  500-year floods are storms with a return frequency of 500 years or more—or storms that occur once about every 500 years.  Properties within the 100-year floodplain have a 1-in-100 chance of flooding in a given year and are expected to flood once every 100 years or more.  Properties located outside the 500-year floodplain are expected to flood less than once every 500 years.

<a/>

Case 1:17-cv-09002-LAS   Document 203   Filed 02/18/20   Page 6 of 19

which allowed the daily reservoir inflows to pass through the gates. Def.'s Ex. 8 at 280–91; Def.'s Ex. 22 at 997, 999. That night, in anticipation of flooding from Harvey, the Corps closed the gates on both the Addicks and Barker dams. Def.'s Ex. 8 at 291; Def.'s Ex. 21; Def.'s Ex. 24 at 1010. On August 26, 2017, the Corps noted that "[w]ith rainfall continuing over the next 5+ days, the reservoirs are expected to exceed record pools." Def.'s Ex. 23 at 1004–05. At that time, however, the Corps did not expect to "make mandatory releases for surcharge operations." *Id.* On August 27, 2017, the CWMS Forecast indicated that conditions had changed, and noted the following:

> The Addicks and Barker watersheds have received 10-18 inches across the watersheds in the last 48 hours. Gates are currently closed. Forecasted rainfall amounts are in flux. The 7-day accumulation assumed for this forecast is approximately 30-inches as received from the River Forecasting Center.
>
> At this time, mandatory releases are expected to be necessary for surcharge operations at Addicks later tonight and at Barker on Wednesday.

Def.'s Ex. 25 at 1018–19; Pls.' App. at A3141. On August 27, 2017, peak inflows into the Addicks Reservoir were approximately 70,000 cubic feet per second ("cfs"), and peak inflows into Barker were approximately 77,000 cfs. Pls.' App. at A3157–A3158. As a result, a Stage 2 Extended Watch alert was triggered, and the Corps began 24/7 monitoring of the Reservoirs in accordance with the Emergency Action Plan for Addicks and Barker Dams. Pls.' App. at A1158. On August 27, 2017, the pool of floodwater behind the Barker Reservoir exceeded the government-owned land, and on August 28, 2017, the pool of water behind the Addicks Reservoir exceeded the government-owned land. Def.'s Ex. 26 at 1028.

At approximately midnight on August 28, 2017, for the first time since the Reservoirs' construction, and in accordance with the Manual's Induced Surcharge Flood Control Regulation, the Corps began releasing water from both Reservoirs. Pls.' Appx at A1158; Def.'s Ex. 27 at 1034–35; Def.'s Ex. 8 at 287. Despite these releases, the reservoir pools behind the dams continued to rise. *See* Def.'s Ex 26; Def.'s Ex 28. On August 30, 2017, even as the Reservoirs were releasing water, both Reservoirs experienced record-level pool elevations, with water in the Addicks Reservoir reaching an elevation of 109.1 feet and Barker Reservoir reaching a pool elevation of 101.6 feet. Pls.' App. at A1158; Pls.' App. at A3157–A3158; Def.'s Ex. 24 at 1014; Def.'s Ex. 29. The CWMS Forecast issued that same day reported that the Addicks and Barker Reservoirs had received between 32-35 inches of rain since the beginning of Harvey; that the Addicks Dam was releasing approximately 7,500 cfs downstream; that the Barker Dam was releasing approximately 6,300 cfs downstream; and that the total combined discharge was approximately 13,800 cfs. *See* Def.'s Ex. 28 at 1041–42.

On August 31, 2017, the CWMS Forecast reported that uncontrolled water was flowing around the north end of the Addicks Dam, but that such uncontrolled flows were only expected to continue until September 2, 2017. Def.'s Ex 29 at 1048–50. As of that announcement date, "[e]levated discharges [were] expected to continue for at least 10+ days, before resuming normal rates of less than 4000 cfs combined total discharge." *Id.* In reality, however, surcharge releases of floodwaters remained necessary until September 16, 2017, at which point normal operations

6

resumed. Def.'s Ex. 24 at 1016. The Reservoirs did not return to their normal, fully drained state until mid-October 2017. Def.'s Ex. 12 at 604. Despite the Corps' attempt to mitigate against flooding from Harvey's record-setting storm, plaintiffs' properties downstream of the Reservoirs sustained significant flood damage. In an attempt to ameliorate the effects of the damage caused by that record-setting natural disaster, FEMA has obligated over $1.6 billion in approved grants through the individual and households program and over $2 billion in obligated public assistant grants for disaster relief efforts. FED. EMERGENCY MGMT. AGENCY, https://www.fema.gov/disaster/4332 (last visited Jan. 22, 2020).

## II. Procedural History

### A. *In re Downstream Addicks and Barker (Texas) Flood-Control Reservoirs*

Beginning in September of 2017, property owners in the Houston area began filing complaints with this Court, alleging that the flooding that occurred during or immediately following Hurricane Harvey constituted an unconstitutional taking of their property. All related cases were joined under a Master Docket (No. 17-3000), and then bifurcated into an Upstream Sub-Docket (No. 17-9001) and a Downstream Sub-Docket (No. 17-9002). *See* Order Severing Claims into Two Separate Dockets, No. 17-3000, ECF No. 102. To streamline litigation, the Court designated a group of test properties and administratively stayed all other claims. Order Regarding Test Property Selection, No. 17-9002, ECF No 81; Case Management Order No. 5, No. 17-9002, ECF No. 27.

On February 20, 2018, in the Downstream Sub-Docket, defendant filed a motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). *See* United States' Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted (hereinafter "Def.'s MTD"). In that Motion, defendant argued that, under both state and federal law, plaintiffs lack the property interest purportedly taken, and that, to the extent a cause of action could arise out of the circumstances at issue, such a claim sounds exclusively in tort. *See generally id.* On March 20, 2018, plaintiffs filed their Response to the government's Motion to Dismiss, arguing that they sufficiently pleaded their cause of action demonstrating that the Corps' actions gave rise to a taking and that their ownership of property in fee simple—as defined by the Texas Tax Code—necessarily affords them the right to be "free from the Federal Government storing water on their property." *See* Pls.' Resp. to MTD at 14. The government filed its Reply in Support of its Motion to Dismiss on April 11, 2018, reiterating its original arguments for dismissal. *See generally* United States' Reply in Support of its Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted (hereinafter "Def.'s Reply to MTD").

On April 19, 2018, Judge Susan G. Braden deferred ruling on defendant's Motion to Dismiss until trial and set a pre-trial and discovery schedule. Memorandum Opinion and Scheduling Order, ECF No. 92. On January 7, 2019, the Downstream Sub-Docket was reassigned to Senior Judge Loren A. Smith. *See* Order of Reassignment, ECF No. 152. Due to a lapse in government appropriations and upon finding that the current pre-trial and trial schedule

was "infeasible and inoperable," the Court vacated the schedule and stayed the case pending the restoration of government funding. Order, ECF No. 154. After the restoration of funding, the Court determined that jurisdiction was a threshold issue that should be decided in advance of trial and held a hearing in Houston, Texas on March 13, 2019, regarding defendant's Motion to Dismiss.

On April 1, 2019, the Court deferred its ruling on the Motion to Dismiss in order to concurrently rule on both dismissal and on cross-motions for summary judgment. *See*, ECF No. 169. The Court also ordered briefing on Cross-Motions for Summary Judgment, and each party was allotted an additional ten pages in which to further address the following two questions:

1. Whether a protected property interest exists under Texas law when flooding has occurred as a direct result of mitigating flood control efforts in the face of an Act of God; and

2. The general applicability of the Flood Control Act of 1928, its successor acts, and the definition of "floods or flood waters."

*Id.* at 1. Plaintiffs filed their Motion for Summary Judgment on June 14, 2019. *See* Motion for Summary Judgment and Memorandum in Support (hereinafter "Pls.' MSJ"). Defendant filed its Cross-Motion for Summary Judgment on August 3, 2019, and its Corrected Cross-Motion for Summary Judgment on August 5, 2019. *See generally* United States' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment; *see also generally* United States' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (Corrected) (hereinafter "Def.'s CMSJ"). Plaintiffs filed their Reply and Response on September 16, 2019. *See generally* Plaintiffs' Reply in Support of Motion for Summary Judgment and Response to United States' Cross-Motion for Summary Judgment (hereinafter "Pls.' MSJ Resp."). On October 15, 2019, the government filed its Reply in Support of its Cross-Motion for Summary Judgment. *See generally* United States' Reply to Plaintiffs' Response to the United States' Cross-Motion for Summary Judgment (hereinafter "Def.'s CMSJ Reply."). Oral Argument on the parties Cross-Motions for Summary Judgment was held in Houston, Texas on December 11, 2019. At oral argument, the Court encouraged the parties to pursue settlement, but on February 13, 2020, the parties informed the Court that settlement was unsuccessful. This case is fully briefed and ripe for review.

### B. *In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*

During the pendency of the Downstream Sub-Docket proceedings, the parties in the Upstream Sub-Docket proceeded to a trial on liability. On December 17, 2019, Senior Judge Charles F. Lettow issued an opinion on liability, holding that the upstream flooding "constituted a taking of a flowage easement under the Fifth Amendment." *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, No. 17-9001, 2019 U.S. Claims LEXIS 1976, at *120 (Fed. Cl. Dec. 17, 2019) (hereinafter "Upstream Opinion"). In that case, the plaintiffs' theory of causation involved the inundation of water on their upstream properties "resulting from the Corps' construction, modification, maintenance, and operation of the Addicks and Barker Dams." *Id.* at *89.

In that opinion, Senior Judge Lettow determined that the taking of upstream property occurred as a result of the general operation of the Addicks and Barker Dams and Reservoirs, as a direct result of the Corps' decision to close the flood gates in order to protect properties downstream at the expense of the upstream properties located within the maximum pool size for the Reservoirs. *See generally id.* In contrast, the Downstream plaintiffs do not allege that the general operation of the Reservoirs caused the flooding of their property. *See generally* Complaint; *see also* Pls.' MSJ. Rather, plaintiffs downstream advance a takings theory predicated on the Corps' decision to open the flood gates and begin Induced Surcharge releases. Pls.' MSJ at 32 ("The Government caused the flooding of Plaintiffs' properties by opening the gates and releasing water from the Reservoirs."). As more fully explained below, the downstream plaintiffs' theory of causation ignores the simple fact that the gates were initially closed for the sole purpose of protecting *their* properties from floodwaters, that such mitigation failed because the impounded storm waters exceeded the Reservoirs' controllable capacity, and that the Harvey was the sole and proximate cause of the floodwaters.

With those legal differences between the Upstream and Downstream causes of action in mind, the Court concludes that the legal analysis in the Upstream Opinion is not relevant to the Court's evaluation of the downstream cause of action. Additionally, due to the significant factual differences between the Upstream and Downstream cases, the Court does not believe the findings in the Upstream Opinion are relevant to its downstream findings.

### III. Discussion

The Court will dismiss a case under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Spectre Corp. v. United States*, 132 Fed. Cl. 626, 628 (2017) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). In reviewing a motion to dismiss for failure to state a claim, the Court "must accept as true all the factual allegations in the complaint . . . and [] must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). The Court need not, however, accept legal conclusions "cast in the form of factual allegations," and will grant a motion to dismiss when faced with conclusory allegations that lack supporting facts, as "a formulaic recitation of the elements of a cause of action" alone will not withstand a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Takings Clause of the Fifth Amendment of the Constitution provides "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. When analyzing a takings claim, the Court will implement a two-step process. *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). The Court's first step is to determine "whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a stick in the bundle of property rights." *Id.* at 1343 (citing *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (citations omitted)). Once the Court has determined that the plaintiff possesses the requisite property right, the Court then decides "whether the governmental action at issue constituted a taking of that stick." *Id.*

On August 25, 2017, Hurricane Harvey made landfall along the Texas coast as a Category 4 hurricane. Pls.' App. at A3134. In anticipation of high volumes of rain, the Corps closed the flood gates on both the Addicks and Barker dams to mitigate against downstream flooding. *See* Def.'s Ex. 8; Def.'s Ex. 21; Def.'s Ex. 24 at 1010. For four days Harvey was stalled over Houston, and in the early hours of August 28, 2017, the volume of water in the Reservoirs exceeded the capacity of the government-owned land, began to spill onto adjacent non-government-owned properties, and the Corps was forced to release water from both Reservoirs in accordance with the Induced Surcharge Flood Control Regulation provided in its Manual. Pls.' Appx at A1158; Def.'s Ex. 27 at 1034–35; Def.'s Ex. 8 at 287. Despite the Corps' attempt to save the downstream properties from Harvey's floodwaters, plaintiffs' properties were inundated with water. These approximately 170 downstream cases ensued, and they turn on the following singular question:

> Do plaintiffs have a protected property interest in perfect flood control, under either federal or state law, when a government-owned water control structure erected for the sole purpose of flood control fails to completely mitigate against flooding created by an Act of God?

Upon careful consideration, and with all due sympathy to the plaintiffs' plight, the Court finds that, under both federal and state law, plaintiffs lack the requisite property interest in perfect flood control in the face of an Act of God, and thus cannot succeed on their takings claims.

### A. Property Rights

The courts have long held that "[f]or a takings claim to succeed under the Fifth Amendment, under either a physical invasion or regulatory takings theory, a claimant must first establish a compensable property interest." *Avenal v. United States*, 33 Fed. Cl. 778, 785 (1995) (citing *Lucas v. S.C. Costal Council*, 505 U.S. 1003, 1026–27 (1992)). Moreover, "not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion." *United States v. Willow River Power Co.*, 324 U.S. 499, 502 (1945); *see also Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed. Cir. 1993) ("As part of a takings case, the plaintiff must show a legally-cognizable property interest.").

The Supreme Court has repeatedly held that "state law defines property interests." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010); *see also Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'"); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."); *Maritrans Inc. v. United States*, 342 F.3d 1344, 1352–53 (Fed. Cir. 2003) ("Property rights are set by state law and federal common law but are not created by the constitution.");

*Bartz v. United States*, 224 Ct. Cl. 583, 592 (1980) ("[T]he issue of what constitutes a 'taking' is a 'federal question' governed entirely by federal law, but that the meaning of 'property' as used by the Fifth Amendment will normally obtain its content by reference to state law."). The laws of a given state identify what rights and property interests are constitutionally protected. *See id.*

In *Stop the Beach*, the Supreme Court explained that "[t]he Takings clause only protects property rights as they are established under state law, not as they might have been established or ought to have been established." 560 U.S. at 732. As a result, the Court *must* look to state law in determining whether a plaintiff possesses the property rights purported to have been taken. *See id.* As such, the Court turns both to the laws of the State of Texas and to federal law to determine whether plaintiffs have a protected property interest in perfect flood control in the wake of an Act of God.

### B. Perfect Flood Control

#### 1. State Law

As property rights are defined by state law, the Court must look to Texas law to determine whether plaintiffs have a protected property interest in perfect flood control in the wake of an Act of God. After careful review of over 150 years of Texas flood-related decisions, the Court finds that the State of Texas has never recognized such a property right, and, in fact, that the laws of Texas have specifically excluded the right to perfect flood control from the "bundle of sticks" afforded property owners downstream of water control structures. *See, e.g.*, *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793 (Tex. 2016); *Sabine River Auth. of Tex. v. Hughes*, 92 S.W.3d 640 (Tex. App.—Beaumont 2002). Based on the Court's understanding of Texas jurisprudence, and for the reasons set forth below, the Court concludes that Texas does not recognize a right to perfect flood control in the wake of an Act of God.[3]

Article 17 of the Texas State Constitution provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. Nevertheless, the Texas State Constitution also specifically enumerates that the police power is an exception to takings liability and that compensation is not required for "an incidental use, by (A) the State, a political subdivision of the State, or the public at large; or (B) an entity granted the power of eminent domain under law." TEX. CONST. art. I, § 17(a)(1)(A)–(B). Texas courts have routinely interpreted this clause to mean that property is owned subject to the pre-existing limits of the State's police power. *See generally Motl v. Boyd*, 286 S.W. 458 (Tex. 1926); *see also Lombardo v. Dallas*, 124 Tex. 1, 10 (Tex. 1934) ("All property is held subject to the valid exercise of the

---

[3] In analyzing whether Texas law recognizes the right to perfect flood control in the wake of an Act of God, the Court has looked to both takings and tort cases to reach the conclusion that Texas has never recognized such a right. Additionally, the Court finds it significant that, even when Texas courts have applied the less stringent standards for establishing tort liability, those courts have never found that a right to be free from flooding is absolute or a legally protected interest. *See, e.g.*, *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793 (Tex. 2016); *McWilliams v. Masterson*, 112 S.W.3d 314, 321 (Tex. App.—Amarillo 2003).

police power."); *Cummins v. Travis County Water Control & Improvement Dist. No. 17*, 175 S.W.3d 34, 48 (Tex. App.—Austin 2005) ("[A]ny such rights an owner may have can only be exercised in a reasonable fashion and are subject to the State's police powers"). Texas courts have also consistently recognized efforts by the State to mitigate against flooding as a legitimate use of the police power. *See generally Motl*, 286 S.W. 458.

The Texas Supreme Court has long recognized that flooding is a major issue within the state's borders and that the government must endeavor to control it. *See, e.g.*, *Motl*, 286 S.W. 458. In 1926, the Supreme Court of Texas explained that "[o]ver 30,000,000 acre-feet of water annually passes unutilized from the streams of Texas to the Gulf of Mexico, much of it in floods that cause great destruction. Good business sense demands that the floods of Texas be controlled." *Id.* at 469. In highlighting the importance of flood mitigation, the *Motl* Court noted that "flood waters are to be treated as a common enemy, the control and suppression of which is a public right and duty." 286 S.W. at 470. This decision demonstrates that the right to protect the public from flooding is not something new, but rather "of ancient origin, universal in its extent." *Id.* In fact, flood mitigation is not only a right but a duty, and

> [t]o deny that the State of Texas has [the] power and authority to ameliorate [destructive flooding], and to cause the storing of these floods waters, both for the protection of the people and for the reclamation and development of its lands by irrigation, is to deny to the State one of the ancient rights of the police power.

*Id.* at 471. The Court interprets such precedent to stand for the conclusion that Texas law clearly recognizes the state's authority to mitigate against flooding to be a legitimate use of the police power. Additionally, Texas jurisprudence illuminates precisely how the state's police power is superior to the rights of property owners, and waters are "subject to regulation and control by the State, regardless of the riparian's land which may border upon the stream." *Id.* at 474; *see also Cummins*, 175 S.W.3d at 49 ("[O]wnership of waterfront property is subject to regulation under the State's police powers and, hence, their rights must yield to the regulations that serve the public's interest."). As such, the plaintiffs in this case own their land subject to the legitimate exercise of the police power to control and mitigate against flooding.

In addition to holding that efforts expended to mitigate against flooding constitute a legitimate use of the police power, Texas courts have rejected the theory that failure to perfectly mitigate against Acts of God can rise to the level of a taking under Texas law. The court in *McWilliams v. Masterson* held that "[i]t has long been the rule that one is not responsible for injury or loss caused by an act of God." 112 S.W.3d 314, 321 (Tex. App.—Amarillo 2003) (citations omitted); *see also Luther Transfer & Storage, Inc. v. Walton*, 296 S.W.2d 750, 753 (Tex. 1956) ("Damages resulting from an act of God are not ordinarily chargeable to anyone."); *Benavides v. Gonzalez*, 396 S.W.2d 512, 514 (Tex. App.—San Antonio 1965) (holding that "[u]nprecedented rainfall or Act of God is uniformly recognized as a good defense" to diversions of water.). Under Texas law, to determine whether an occurrence was an Act of God, a court need only ask whether it was "so unusual that it could not have been reasonably expected or provided against." *Gulf, C. & S. F.R. Co. v. Texas Star Flour Mills*, 143 S.W. 1179, 1182 (Tex. Civ. App. 1912). As Harvey was a 2000-year storm, the likes of which the Houston area had

never seen, the storm was of a kind that "could not have been reasonably expected or provided against." *Id.* As such, the Court concludes that Harvey was most assuredly an Act of God.[4]

When determining whether a party is liable for flood-related damage to another's property, Texas courts have routinely held that "it must be shown that [an] unlawful act caused damages to the owner which would not have resulted but for such act." *Benavides v. Gonzalez*, 396 S.W.2d 512, 514 (Tex. App.—San Antonio 1965). "Proof of damage alone will not suffice to prove a taking." *Bennett v. Tarrant County Water Control and Imp. Dist. No One*, 894 S.W.2d 441 (Tex. App—Fort Worth 1995) (citing *Loesch v. United States*, 227 Ct. Cl. 34, 44, 645 F.2d 905, 914, *cert. denied*, 454 U.S. 1099 (1981)). Texas law has specifically limited liability in both a takings and a tort context where the operator of a water control structure fails to perfectly mitigate against flooding caused by an Act of God. *See Kerr*, 499 S.W.3d 793. This limitation on property rights exists both when the operator fails to do more to protect downstream properties from flooding, and when the operator induces the release of water, so long as the water is released at a lesser rate than it is impounded. *See id.*; *see also Sabine River Auth.*, 92 S.W.3d 640. Regardless of the intentionality of the waters' release, the Court does not believe that Texas law provides plaintiffs with a right to be free from flood waters.

In one case where property owners alleged that a water control structure "could have done more" to ensure their properties were free from flooding, the Texas Supreme Court held that "[governments] cannot be expected to insure against every misfortune occurring within their geographical boundaries, on the theory that they could have done more. No government could afford such obligations." *Kerr*, 499 S.W.3d at 804 (citing *Terminiello v. City of Chicago*, 337 U.S. 1, 37, (1949) (Jackson, J., dissenting) ("There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact."); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963) ("[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact.")). In analyzing whether the county was liable for the flooding beyond its control, the court highlighted that "because inaction cannot give rise to a taking, we cannot consider any alleged failure to take further steps to control flooding." *Kerr*, 499 S.W.3d at 805; *see also Cameron Cty. Reg'l Mobility Auth. v. Garza*, No. 13-18-00544, 2019 Tex. App. LEXIS 8968, at *9 (Tex. App.—Corpus Christi 2019) ("A governmental entity cannot be liable for a taking if it committed no intentional acts."). In finding for the defendant, the *Kerr* Court "decline[d] to extend takings liability . . . in a manner that makes the government an insurer for all manner of natural disasters," because to find otherwise would "encourage governments to do nothing to prevent flooding, instead of studying and addressing the problem." *Id.* at 810; *see also Texas Highway Dep't v. Weber*, 219 S.W.2d 70 (Tex. 1949) ("If the state were suable and liable for every tortious act of its agents, servants, and employees committed in the performance of their official duties, there would result a serious impairment of the public service and the necessary

---

[4] Of note, this Court's finding that plaintiffs' flood-related damage is the result of an Act of God is consistent with the findings of the United States District Court for the Southern District of Texas, which, in a negligence proceeding, determined that "the storm surge from Harvey" was an "Act of God" that contributed to plaintiff's property damage. *Landgraf v. Nat Res. Conservation Serv.*, No. 6:18-CV-0061, 2019 U.S. Dist. LEXIS 61198, at *4 (S.D. Tex. Apr. 9, 2019).

administrative functions of government [sic] would be hampered"). Interpreted collectively, it is the Court's understanding that Texas does not recognize the right to be free from unintentional flooding resulting from an Act of God.

In addition to finding that uncontrollable flooding cannot result in a taking, the Court in *Kerr* also highlighted that intent alone is not enough to establish causation in a takings context, and explained that "[b]ecause a taking cannot be premised on negligent conduct, we must limit our consideration to affirmative conduct the County was substantially certain would cause flooding to the homeowners' properties and ***that would not have taken place otherwise***." *Kerr*, 499 S.W.3d at 805 (emphasis added). Under Texas law, even when a release of water is intentional, a taking does not occur where "the [water control structure] never released more water than was entering the reservoir via rainfall." *Sabine River Auth.*, 92 S.W.3d at 642 (citing *Wickham v. San Jacinto River Authority*, 979 S.W.2d 876, 880 (Tex. App.—Beaumont 1998)). This is particularly true where the water is not released directly onto a plaintiff's property, but rather is released into a river that consequently floods properties downstream. In *Wickham v. San Jacinto River Authority*, the Texas Supreme Court specifically determined the following:

> In addition to the fact that appellee never released more water than was entering the San Jacinto River, Adams' deposition testimony makes it clear that the water being released from Lake Conroe was flowing directly into the San Jacinto River, not directly onto appellants' property. From the point of release, the water flowed into the River and went downstream and mixed into other tributaries which apparently overflowed their banks[,] resulting in flooding. Standing alone, this would be sufficient summary judgment evidence to negate the "taking" element in appellants' inverse condemnation claim.

979 S.W.2d at 883. Under Texas law, even an intentional release of water does not give rise to a takings claim unless the flood control structure releases more water than is entering the reservoir.[5] *See Sabine River Auth.*, 92 S.W.3d 640; *see also Wickham*, 979 S.W.2d 876. As such, under Texas law, the "bundle of sticks" afforded property owners does not include to right to be free from all flooding, regardless of the intentionality behind the water's release.

Finally, Texas law also indicates that, when an individual purchases real property, the individual acquires that property subject to the property's pre-existing conditions and limitations. *See generally City of Dallas v. Winans*, 262 S.W.2d 256 (Tex. Civ. App.—Dallas 1953); *see also City of Tyler v. Likes*, 962 S.W.2d 489 (Tex. 1997). A cause of action can only occur when the injury arises, and a subsequent property owner cannot inherit that cause of action. *See, e.g.*, *Winans*, 262 S.W.2d at 259 ("The concrete culvert in question is a public improvement permanent in nature. If its construction injured the land at all, it was a permanent injury which had already occurred when appellee acquired the property, and no right of action accrued to

---

5  The Court notes that, in the wake of Harvey, water flowed into Addicks at 70,000 cfs and into Barker into 77,000 cfs. Pls.' App. at A3157–A3158. Despite the high inflow of water, the outflow from Addicks was only approximately 7,500 cfs, the outflow from Barker was only approximately 6,300 cfs, and the totally combined discharge was approximately 13,800 cfs at its peak. Def.'s Ex 28. Texas law would not have recognized a taking under such circumstances.

appellee."); *see also Likes*, 962 S.W.2d 489 (finding no taking where the culvert system was completed more than ten years before plaintiff's home was built, and where the City had not made improvements since its construction to increase the amount of water in the watershed.). As each of the plaintiffs in this case acquired their property *after* the construction of the Addicks and Barker Dams and Reservoirs, plaintiffs acquired their properties subject to the superior right of the Corps to engage in flood mitigation and to operate according to its Manual.

Before the Court can analyze whether a Fifth Amendment Taking has occurred, the Court first must look to what property interest was allegedly taken. Federal law dictates that "the issue of what constitutes a 'taking' is a 'federal question' governed entirely by federal law, but that the meaning of 'property' as used by the Fifth Amendment will normally obtain its content by reference to state law." *Bartz*, 224 Ct. Cl. at 592. While none of the aforementioned Texas jurisprudence is persuasive on our analysis of whether a Fifth Amendment Taking has occurred under federal law, the storied history of Texas law makes it clear that the State of Texas never intended to create a protected property interest in perfect flood control in the wake of an Act of God. As the State of Texas does not recognize such a right, the Court now looks to whether federal law provides plaintiffs with the right to perfect flood control in the wake of an Act of God.

### 2. Federal Law

While "state law defines property interests," *Stop the Beach*, 560 U.S. at 707, federal common law may also identify which property rights are protected under the Constitution. *See Maritrans*, 342 F.3d at 1352–53 ("Property rights are set by state law and federal common law but are not created by the constitution"). As Texas law does not recognize a protectable property interest in perfect flood control in the face of an Act of God, the Court now looks to whether federal common law provides plaintiffs with such a protected property interest. Also, federal statutes can create specific property interests for particular individuals, but this is rare. *See generally Grav v. United States*, 14 Cl. Ct. 390 (1988) (holding that a statutory offer that invited performance as the method of acceptance creates an implied-in-fact contract for which a plaintiff must be compensated), *aff'd*, 886 F.2d 1305 (Fed. Cir. 1989). After careful review of related legal precedent, statutes, the Court finds that such a "property right" does not exist under federal law either.

Plaintiffs repeatedly argue that, because their properties had never flooded before (or at the very least because such flooding was minimal), they had a "reasonable, investment-backed expectation" that they would remain free from flooding. Pls.' MSJ at 32. Additionally, plaintiffs seemingly contend that, even though the Reservoirs were dry prior to Harvey's landfall, the simple fact that the water passed through the Reservoirs before inundating plaintiffs' properties means that all of the water was Corps' water, as opposed to "flood water." *See* Pls.' MSJ at 32; *see also* Pls.' Resp. to MTD at 23. In response, defendant argues that plaintiff's takings claim fails because plaintiffs have failed to prove causation, and, in the alternative, that plaintiffs lack the property interest purportedly taken. *See generally* Def.'s CMSJ. The Court rejects both of plaintiff's assertions.

The Court believes plaintiffs mischaracterized the events that preceded the flooding of their properties. As an initial matter, the government's construction of the Reservoirs and the resulting benefit of flood control does not, by its nature, affirmatively create a cognizable property interest in perfect flood control. In *Avenal v. United States*, this Court addressed whether a plaintiff could have a vested property interest in a benefit conferred upon them by a federal government project, and, if they could acquire such a right, whether cessation of that benefit could give rise to a Fifth Amendment Taking. 33 Fed. Cl. 778, 787 (1995). In finding for the government, that Court ultimately determined that an unintended benefit could not create a vested property interest, and that "[i]n certain limited circumstances, the Federal Government can eliminate or withdraw certain unintended benefits resulting from federal projects without rendering compensation under the Fifth Amendment." *Id.* at 790. While the facts in *Avenal* are not directly analogous to those in the case at bar, the Court agrees with the overall holding—that even if a plaintiff benefits from a federal project, such a benefit does not in itself create a property interest that is subject to Fifth Amendment compensation when the government later ceases to provide such benefit. *See generally id.*

There is a fundamental difference between property rights and the benefits a government provides to its citizens. To ignore this would be to discard the last several hundred years of Anglo-American legal history. That difference is based upon the relationship between the source of the property and the new owner of the property right. The property right is created by the conveyor and arises out of the conveyor's relationship with the recipient. That relationship most commonly takes the form of a contractual obligation. Furthermore, a property interests can occasionally be created as a gift—for example, an inheritance, an award, or a personal gift. These then become the recipient's property. However, when a government creates programs that benefit its citizens, those programs rarely provide members of the public with property interests. *Cf. Grav*, 14 Ct. Cl. 390. This is because the justification and intention behind the program—be it flood control, the construction of a highway, or some other benefit—is for the general good of the community. It is almost never a benefit intentionally awarded for a specific group of individuals.

Additionally, despite the fact that the Corps has routinely erected water control structures to benefit property owners by mitigating against downstream flooding, the federal government never intended to provide plaintiffs downstream of a water control structure with a vested right in perfect mitigation against "flood waters." To the contrary, Section 702c of the Flood Control Act of 1928 ("FCA") provides that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c (2018). Since the FCA's enactment, the Supreme Court has attempted to distinguish between what is and is not flood water. In *Central Green Co. v. United States*, the Supreme Court held that "the text of the [FCA] directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purpose it serves, but by the character of the waters that caused the relevant damage and the purpose behind their release." 531 U.S. 425, 434 (2001). The Court further outlined when the character of the water is clearly definable and when an ambiguity exists as follows:

> It is relatively easy to determine that a particular release of water that has reached flood stage is "flood water" . . . or that a release directed by a power company for

> the commercial purpose of generating electricity is not . . . . It is, however, not such a simple matter when damage may have been caused over a period of time in part by flood waters and in part by the routine use of the canal when it contained little more than a trickle.

*Id.* at 436 (citations omitted).  Interpreting this precedent, the Court concludes that the character of the release at issue in this case is clearly "a release of water that has reached flood stage." *See id.*  Accordingly, the Court determines that, contrary to plaintiffs' assertion that the Corps affirmatively decided to store its water on their properties, the waters released from the Reservoirs—waters only impounded behind the dams because of the occurrence of a natural disaster—were "flood waters" in excess of what the Corps could reasonably control.  As such, the Court now must look to whether the existence of a dam erected for the sole purpose of protecting downstream properties from "flood waters" affords plaintiffs a vested property interest in perfect flood control when storm waters exceed a volume over which the government can successfully control.

When interpreting the FCA, courts have continuously held that simply owning property that benefits from flood control structures does not by itself confer upon those owners a vested right in perfect flood control.  In fact, the Supreme Court in *United States v. Sponenbarger* categorically rejected the proposition that a Fifth Amendment Taking can arise as a result of flooding that the government did not cause and over which the government had no control.  308 U.S. 256 (1939).  The Court specifically held the following:

> An undertaking by the Government to reduce the menace from flood damages which were inevitable but for the Government's work does not constitute the Government a taker of all lands not fully and wholly protected.  When undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every landowner which it fails to or cannot protect.

*Id.* at 265.  Essentially, when the government undertakes efforts to mitigate against flooding, but fails to provide perfect flood control, it does not then become liable for a compensable taking because its mitigative efforts failed.  *See id.*  Indeed, "[i]f major floods may sometime in the future overrun the river's banks despite—*not because of*—the Government's best efforts, the Government has not taken [plaintiff's] property." *Id.* at 266 (emphasis added).  In its decision, the Supreme Court extended that same holding to cases in which other properties benefited from the project, as "the Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally before the evil can be attacked at all." *Id.*  To find otherwise "would far exceed even the 'extremest' [sic] conception of a 'taking' by flooding within the meaning of that Amendment.  For the Government would thereby be required to compensate a private property owner for flood damages which it in no way caused." *Id.* at 265.

In the years following, this Court has routinely upheld the Supreme Court's ruling in *Sponenbarger*—that the government cannot be held liable under the Fifth Amendment for property damages caused by events outside of the government's control.  For example, in *Teegarden v. United States*, this Court held that "[i]n the context of a claim for inverse

17

condemnation, damages resulting from 'a random event induced more by an extraordinary natural phenomenon than by Government interference' cannot rise to the level of a compensable taking, 'even if there is permanent damage to property partially attributable to Government activity.'" 42 Fed. Cl. 252, 257 (1998) (citing *Berenholz v. United States*, 1 Cl. Ct. 620, 626 (1982) (quoting *Wilfong v. United States*, 202 Ct. Cl. 616, 622 (1973))). In *Hartwig v. United States*, this Court held that "the United States is not liable for all of the damages caused by a flooding unless directly attributable to governmental action. Indirect or consequential damages are not compensable." 202 Ct. Cl. 801, 809 (1973); *see also Danforth v. United States*, 308 U.S. 271 (1939) (holding that "an incidental consequence" of a levee's construction cannot give rise to a taking); *Sanguinetti v. United States*, 264 U.S. 146 (1924) ("[T]he injury was in its nature indirect and consequential, for which no implied obligation on the part of the Government can arise."); *John Horstmann Co. v. United States*, 257 U.S. 138 (1921) ("[W]hat is done may be in the exercise of a right and the consequences only incidental, incurring no liability."); *R. J. Widen Co. v. United States*, 357 F.2d 988 (Ct. Cl. 1966) ("[C]ompensation under the Fifth Amendment may be recovered only for property taken and not for incidental or consequential losses, the rationale being that the sovereign need only pay for what it actually takes rather than for all that the owner has lost."); *B Amusement Co. v. United States*, 180 F. Supp. 386 (Ct. Cl. 1960) ("It is well settled that consequential damages form no basis for such a recovery [under the Takings Clause of the Fifth Amendment]."). Thus, federal precedent clearly supports the Court's finding that a "natural phenomenon"—or Act of God—cannot trigger takings liability, particularly as plaintiffs do not possess a protected property interest in perfect flood control during and after a natural disaster.

In sum, there exists no cognizable property interest in perfect flood control against waters resulting from an Act of God, and "the Fifth Amendment does not make the Government an insurer" against flooding on a plaintiff's real property when the government fails to completely protect against waters outside of its control. *Sponenbarger*, 308 U.S. at 265. The mere fact that plaintiffs' properties had not sustained this level of flooding prior to Harvey's landfall does not create the right to or provide plaintiffs with a legitimate, investment-backed expectation in perfect flood control. Furthermore, the Court must categorically reject plaintiffs' arguments that the water on their properties was Corps' water. The Reservoirs are dry reservoirs and they contained no water until Harvey made landfall. Def.'s Ex. 22 at 997, 999; Def.'s Ex. 8 at 280–91. The closing and later opening of the gates under the Corps' induced Surcharge operation does nothing to make the water "government water," as opposed to "flood waters" as articulated in *Central Green*. 531 U.S. 425.

### IV. Conclusion

Based on the above analysis of both state and federal law, it seems clear to this Court that neither Texas law nor federal law provides plaintiffs with a cognizable property interest in perfect flood control in the wake of an Act of God. As the government cannot take a property interest that does not exist, and as the Corps cannot be held liable when an Act of God inundates a plaintiff's real property with flood waters that the government could not conceivably have controlled, plaintiffs have failed to state a claim upon which relief can be granted. *See* RCFC 12(b)(6).

Though the Court is sympathetic to the losses plaintiffs suffered as a result of Hurricane Harvey, the Court cannot find the government liable or find it responsible for imperfect flood control of waters created by an Act of God.  For the reasons set forth above, defendant's MOTION to Dismiss is hereby **GRANTED** pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief could be granted.  Defendant's CROSS-MOTION for Summary Judgment is **GRANTED**.  Plaintiffs' CROSS-MOTION for Summary Judgment is **DENIED**.  A telephonic status conference will be held on Wednesday, February 26, 2020 at 3:00 p.m. (EDT), regarding this Opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge